**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| **WEG ELECTRIC CORP.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE NO.:** |
| | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **MICHAEL RHODES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff WEG Electric Corp. ("**WEG**"), by and through undersigned counsel, files the following Complaint against Defendant Michael Rhodes ("**Defendant**" or "**Rhodes**").

## PRELIMINARY STATEMENT

1.     This is a clear case of information theft. Rhodes is a former Business Development Manager who covertly stole a multitude of WEG's confidential, proprietary, and trade secret information, including: (a) business contact, pricing, and/or technical data for over 100 current and former customers; (b) business development plans and pricing strategy documents; and (c) customer lead and proposal documents.

2.     Specifically, in violation of his contractual and legal obligations to WEG, Rhodes began transferring WEG's confidential and trade secret information

1

and saving new WEG confidential and trade secret information to a personal hard drive—a PHD 3.0 Silicon-Power SCSI Disk Device, Serial Number/UID 20016017052030000146 (the "**Hard Drive**")—beginning in August of 2023. **Exhibit A**, Declaration of Greg Freemyer ¶¶ 3-8. Rhodes last connected the Hard Drive to his WEG laptop on June 3, 2024. To date, Rhodes remains in possession of the Hard Drive and all of the WEG information that Rhodes saved to it.

3.     Despite multiple demands that Rhodes provide the Hard Drive to a forensic neutral for imaging and return of WEG's data, as of the filing of this complaint Rhodes retains possession of the Hard Drive. Instead, Rhodes returned what he claims to be a copy of the WEG data that was on the Hard Drive and that otherwise remains in his possession. The information that Rhodes retained consists of thousands of WEG files.

4.     Additionally, a preliminary forensic review already indicates that Rhodes omitted significant WEG information from the data he returned. In other words, Rhodes was not honest when he claimed to have returned a copy of all WEG confidential business information and cannot be trusted to comply with his obligations short of a court order. **Exhibit A, ¶¶** 8-14.

5.     Furthermore, starting June 2, 2024, two days prior to Rhodes providing notice of his intention to leave the company, he deleted numerous proprietary files

from his WEG laptop and WEG's OneDrive Cloud Account, thereby interrupting WEG's service of at least one customer and an ongoing bid with another.

6.      The information that Rhodes transferred to the Hard Drive and/or deleted from WEG's devices and accounts goes to the core of its rapidly developing and highly competitive battery energy storage solutions ("**BESS**") business and includes files related to over 100 WEG customers. In fact, the files include:

- Spreadsheets of non-public customer contact information;

- Spreadsheets reflecting previous and ongoing work for customers, including active action items;

- Proposal and project-related documents, including company project references;

- Proprietary pricing documents; and

- Proprietary product information.

**Exhibit A**, ¶ 7; **Exhibit F**. Taken together, these documents would provide a competitor with a detailed roadmap for establishing a similar footprint in the BESS industry.

7.      The documents Rhodes deleted and those he stored on his personal Hard Drive, however, were just the tip of the proverbial iceberg. WEG has learned that at the end of his employment, Rhodes used WEG's Dun & Bradstreet account

credentials to download 3,000 customer leads. To date these leads have not been returned to WEG, deleted, or purged from Rhodes' possession.

8.     WEG has also learned that since at least March 2024, Rhodes has been diverting business opportunities to which he had exposure based on his employment with WEG to his personal email accounts.

9.     Taken together, these acts reflect that Rhodes is preparing to pilfer WEG's business by using WEG's confidential and trade secret information to benefit himself or one of WEG's competitors.

10.     WEG has invested significant time, manpower, and funds to generate the BESS product data, business development strategy, servicing, and customer data that Rhodes stole. Now, Rhodes is in a position to use WEG's trade secret and confidential information to inform a competitor's BESS-related business model and propel that competitor's BESS division forward without that company having to invest large amounts of money and significant time and effort generating its own related business templates, opportunities, sales strategies, and pricing methods. To be sure, Rhodes would have no reason to engage in this conduct unless he intended to use WEG's trade secrets to obtain an unfair and unlawful competitive advantage in the marketplace.

11.     WEG has given Rhodes multiple opportunities to return its confidential information and engage in a supervised process (with protections in place to

safeguard his privacy) to properly and completely purge Rhodes of this data to avoid litigation. To date, however, Rhodes he only returned <u>copies</u> of what he claims to be the WEG-related files in his possession. Rhodes still retains access to other copies of these files, and there are several indications that the data returned does not represent all of the files in his possession.

12.     For example, Rhodes has not returned most (if not all) of the files stored within a folder called "Marketing" that existed on his Hard Drive as of at least May 21, 2023. WEG has learned at least some of this folder's contents based on forensic data showing the files from this folder that Rhodes accessed during the last several months of his employment. **Exhibit A**, ¶¶ 8-14. Based on the file names of these recently accessed documents alone (Product Pricing 02022024.xlsx, [Customer A] Domestic Content.xlsx, and 030773.000.00 WEG - EMS EV Grid Firming R0_20221213.pdf  among others), there can be little doubt that these additional files contain WEG's trade secret and proprietary information.[1] **Exhibit A**, ¶¶ 10-14.

13.     Rhodes' oversight (at best) or deceptive withholding of the data in the Marketing Folder of the Hard Drive demonstrates why WEG cannot rely on Rhodes to purge himself of WEG's trade secrets. WEG thus brings this action to enforce its

---

[1] Out of concern for the privacy of its customers, WEG has created pseudonyms for the customers referenced in this Verified Complaint. It will file an unredacted version of the Complaint, that will reflect the identities of the customers referenced herein, upon entry of a court order granting it the right to file under seal.

legal rights and to stop Rhodes and any competitor acting in concert with him from benefitting now and in the future from WEG's substantial investments in its products, employees, trade secrets, and customer relationships.

14.     Through his acts of misappropriation, Rhodes has injured WEG. If not restrained, Rhodes' unlawful conduct has the potential to cause tremendous damage to WEG. Accordingly, WEG is now forced to seek injunctive relief as well as appropriate monetary damages against Rhodes.

## THE PARTIES

15.     Plaintiff WEG is a Georgia corporation having its principal place of business at 6655 Sugarloaf Parkway, Duluth, Georgia, 30097.

16.     Defendant Rhodes is a former Business Development Manager of WEG. He resides at 711 East Main Street, Roaring Spring, PA 16673.

## JURISDICTION AND VENUE

17.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because WEG is asserting claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

18.     This Court has supplemental jurisdiction over WEG's claims arising under state law pursuant to 28 U.S.C. § 1367.

19.     This Court also has jurisdiction over this entire action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

20.     This Court has general personal jurisdiction over Rhodes pursuant to the forum selection clause contained in Paragraph 6.2 of the Employee Agreement signed by Rhodes (the "**Agreement**"), in which he and WEG agreed as follows:

> This Agreement, the rights and obligations of the parties hereto, and any claims or disputes relating to this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, not including the choice-of-law rules thereof. In the event of any litigation arising out of or relating to this Agreement, the Parties expressly agree to the exclusive jurisdiction and venue in the appropriate state or federal court for Gwinnett County, State of Georgia, and hereby waive any objections or defenses to such forum and venue selection.

*See* **Exhibit B.**

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because of the forum selection clause contained in the Agreement.

## PERTINENT FACTUAL BACKGROUND AS TO ALL COUNTS

**A.     WEG and its BESS Division**

22.     WEG is the subsidiary of a Brazilian parent company that was founded in 1961 and has grown into a global solutions provider of industrial electrical technologies. WEG, its parent company, and its corporate siblings comprise the largest industrial electric motor manufacturer in the Americas and one of the largest

7

manufacturers of electric motors in the world, producing more than 21 million units annually.

23.     Committed to growth on a global scale, WEG, its parent company, and its corporate siblings continually invest in state-of-the-art manufacturing facilities and processes and the development of new and improved industrial electrical solutions. WEG offers a diverse and integrated product line that includes motors, drives, soft starters, controls, panels, transformers, generators, and custom solutions.

24.     WEG, located in Duluth, Georgia, was incorporated in September 1991 to service the U.S. market. However, WEG's parent company had been selling in the United States since 1977. WEG's parent company has manufacturing facilities in the USA, Mexico, Brazil, Argentina, Colombia, India, China, Portugal, South Africa, Austria, and Germany.

25.     WEG serves its U.S. customers by eight Regional Distribution Centers located in Chicago, Illinois; Duluth, Georgia; Harrisburg, Pennsylvania; Houston, Texas; Ontario, California; Portland, Oregon; and Kansas City, Kansas.

**B.     WEG's Protectable Information**

26.     As would be expected for a large sales organization, WEG maintains a large quantity of proprietary information to track performance and also help its Business Development Managers do their jobs.

27.     This proprietary information includes customer contact information, negotiated and/or customer-specific pricing arrangements, ongoing project details, marketing and product information.

28.     This proprietary information helps the Business Development Managers perform their job duties. For instance, Business Development Managers can use WEG's pricing extrapolation and estimation information to competitively price new projects and products for its customers and prospects, both domestically and, in some cases, internationally.

29.     This proprietary information would also be highly useful in the hands of a WEG competitor, as it would permit the competitor to learn about the identity of WEG's customers, the contact information for key decision-makers, the products that WEG has sold to customers (as well as the specifications for those products), the prices at which WEG has sold or offered products, and the profitability of WEG's relationships with those customers.

30.     WEG devotes substantial resources to the protection of information critical to the success of the business, where the value of such information depends on it being maintained as confidential and used only for the benefit of WEG. The compilation and combination of this information is secret, particularly with regard to the business of WEG's BESS Division and provides WEG with a competitive advantage.

31.    As a result of the importance of WEG's proprietary information and the danger it would face if some of that information fell into the hands of a competitor, WEG takes numerous steps to protect the confidentiality of that information. Those steps include the use of non-disclosure agreements and Code of Conduct policies regarding the treatment of confidential information; exit procedures to ensure that departing employees are reminded of their obligations not to retain confidential materials; training on proper treatment of confidential information; IT security measures and policies; and need-to-know restrictions on certain information.

32.    For example, the Code of Ethics used by WEG since 2022, provides the following with respect to treatment of confidential information:

## 2. Information

*We respect confidentiality and ensure the integrity and availability of the information under our responsibility. Confidential and proprietary information may include: product development, projects, new businesses, price lists, profit margins, etc.*

Expected conduct:

a) Keep confidential classified or restrict information to which we may have access, or which may be entrusted to us due to our responsibilities and functions, whether it is owned by WEG or other stakeholders, including personal data of employees.

b) Do not copy or disclose such information totally or in part to any communication channel, except if authorized by the owner of the information or required by law or adjudication.

c) Do not use such information to obtain personal advantages or for third parties.

d) Only provide information requested by the stakeholders when possessing authority or authorized by the supervisor to do so.

e) Provide authorized information in a complete, precise, clear and timely manner.

f) Avoid exposing confidential matters in public places.

g) Do not create, disclose, pass on false information and news regarding WEG and stakeholders.

A copy of the pertinent pages of this WEG's Code of Ethics and Rhodes' acknowledgement thereof is attached hereto as **Exhibit C** and incorporated herein by reference.

33.     WEG's U.S. Based Ethics Policy contains several provisions intended to protect its information. For example, Section 6 provides the following with respect to confidentiality and privacy:

6.0 Confidentiality and Privacy

Should an employee learn of Company confidential information they must:

- Not disclose sensitive information that is not generally available to the public.  Items such as customer data, terms offered or prices charged to a particular customer, marketing or strategic business plans, and product techniques to name a few.
- Continue to treat information as confidential following separation from the Company and return all Company equipment and work materials to the Company.

A copy of the pertinent pages of this WEG's U.S. Based Ethics Policy and Rhodes' acknowledgement thereof is attached hereto as **Exhibit D** and incorporated herein by reference.

34.     WEG's U.S. Based Ethics Policy also provides the following with respect to protection and use of company property:

9.0 Protection and Use of Company Property

All employees are responsible for ensuring that reasonable steps are taken to prevent the theft or misuse of, or damage to Company assets, including all kinds of physical assets and tangible property, as well as confidential information to which one has through the nature of their work. All employees must use equipment, tools, materials, supplies, and employee time only for the Company's legitimate business interests. Company property must not be borrowed, loaned, or disposed of, except in accordance with appropriate Company policies. All employees must use and maintain Company property and resources efficiently and with proper care and diligence.

*Id.*

35.     Finally, with respect to competition and fair dealing, the U.S. Based Ethics Policy Provides:

**11.0 Competition and Fair Dealing**

WEG strives to outperform our competition with exceptional service, technical competence and fair business dealings. The Company does not support unethical or illegal business practices. Employees will be penalized for unfair advantage of anyone through deception, misrepresentation, manipulation, coercion or abuse of privileged information. There are U.S. laws that govern and protect free and fair competition. These laws are broad and far-reaching, regulating our relationship with distributors, suppliers and customers and address such areas as pricing practices, terms of sale, credit terms, termination and many other practices.  Should you have any questions in this area please contact the Finance Manager or General Counsel.

*Id.*

36.    WEG also requires its employees, such as Rhodes, to abide by its IT Network & Internet Usage Policy (the "**IT Policy**"), and "covers all computing devices and resources issued and managed by WEG Electric Corp's Information Technology (IT) Department[--]i.e., Laptops, tablets, mobile phones, etc."  A copy of the pertinent pages of this WEG's IT Network & Internet Usage Policy and Rhodes' acknowledgement thereof is attached hereto as **Exhibit E** and incorporated herein by reference.

37.    WEG's IT Policy contains the following network and internet use limitations, among others:

2.1   Devices, not managed by WEG Electric Corp. Information Technology Services are not permitted on WEG Electric Corp.'s corporate network and are subject to limited access to WEG Electric Corp.'s computing resources and/or automatic disconnect.

2.3   The Company also prohibits the conduct of a business enterprise, political activity, engaging in any form of intelligence collection from our facilities, engaging in fraudulent activities, or knowingly disseminating false or otherwise libelous materials;

2.9    Unless expressly authorized to do so, Users are prohibited from sending, transmitting, or otherwise distributing proprietary information, data, trade secrets or other confidential information belonging to The Company, including the use of Company trademarks in personal computing.

38.    Further, as part of WEG's efforts to protect its confidential and trade secret information, WEG does not allow key employees like Rhodes to access WEG confidential information or trade secrets until after they execute a written non-disclosure agreement.

**C.    Rhodes' Employment and Access to Confidential Information**

39.    Rhodes is a former Business Development Manager for WEG's regional BESS division in the NE region (Maine, Vermont, New Hampshire, Maryland, Massachusetts, Rhode Island, New York, Connecticut, New Jersey, Pennsylvania, and Ohio). Rhodes held this role from May 2, 2022 until his resignation on June 4, 2024.

40.    WEG paid for Rhodes to have access to tools and platforms that provide market intelligence, as well as customer and project leads. WEG also paid for Rhodes to attend trade shows to help him connect with potential customers and build relationships with them.

41.    As a Business Development Manager, Rhodes' primary responsibility was to lead BESS-related sales and business development activities within his sales territory to increase WEG's product sales and market share.

42.   Within that primary responsibility, Rhodes' essential duties were to: (a) develop WEG's go-to-market strategy; (b) identify prospective clients; (c) develop client relationships; (d) identify opportunities (such as requests for quotations and bid submission processes); (e) develop bids and proposals for clients and prospective clients; and (f) negotiate and close contracts.

43.   To perform these functions, Rhodes required access to WEG's confidential, proprietary information such as technical data, research and development technology, commercial offerings, pricing information, marketing strategies, customer proposals, and information on key personnel and prospects. WEG also assisted Rhodes with identifying and securing customer relationships. In other words, WEG paid Rhodes to develop and implement strategies to solicit and sell battery energy storage solutions.

44.   In exchange for the valuable exposure to confidential information and customer relationships, prior to the start of his employment WEG required Rhodes to agree to an in-term non-competition clause and a non-disclosure of confidential information provision in the Agreement.

45.   Specifically, Rhodes' Agreement includes a non-disclosure of confidential information provision that restricts him as follows:

> **4.1 Confidentiality.** Confidential Information, Trade Secrets and Third Party Information. During the course of employment with the Company, Employee understands that he/she will have access to and otherwise make use of, acquire, create, or add to, certain Confidential

Information, Trade Secrets and/or Third Party Information. To the extent Employee has access to the Company's Confidential Information and/or Third Party Information which is not a Trade Secret under applicable law, Employee will, as a term and condition of this Agreement, for so long as Employee is employed with the Company and thereafter for such time as the information remains confidential, protect and maintain the confidentiality of the Company's Confidential Information and/or Third Party Information and refrain from disclosing, copying, using or divulging to any third party, for any reason, any such Confidential Information and/or Third Party Information without the Company's prior written consent, except as necessary in the performance of Employee's duties while employed with the Company.

**4.2   Trade Secrets.** Employee acknowledges and agrees that, with respect to Trade Secrets, Employee shall for as long as such information remains a Trade Secret under law, protect and maintain the confidentiality of the same and refrain from disclosing, copying, using or divulging to any third party, for any reason, any such Trade Secret(s) without the Company's prior written consent, except as necessary in Employee's performance of duties on behalf of the Company.

**4.3 Return of Materials.** Upon the request of the Company and, in any event, upon the termination of Employee's employment with the Company, Employee shall deliver to the Company all memoranda, notes, records, manuals or other documents (including, but not limited to, written instruments, voice or data recordings, or computer tapes, disks or files of any nature), including all copies of such materials and all documentation prepared or produced in connection therewith, pertaining to the performance of Employee's services for the Company, the business of the Company or of the Associated Companies, or containing Trade Secrets or Confidential Information regarding the Company's business or the Associated Companies' business, whether made or compiled by Employee or furnished to Employee by virtue of his/her employment with the Company. Employee shall also deliver to the Company all computers, credit cards, telephones, office equipment, software, and other property the Company furnished to Employee by virtue of his/her employment with the Company.

**Exhibit B**, § 4.

46.     Such restrictions seek to protect WEG's confidential and trade secret business information and prohibit employees from exploiting the WEG's sales strategies, pricing extrapolations, and customer information, all of which WEG has spent countless hours and incalculable expense developing.

47.     The Agreement also contains an Intellectual Property Provision, which states in part:

> **5.1 Ownership by Company:** The Company shall have Intellectual Property Rights, including but not limited to moral rights, in and to all Work Product and Inventions developed by Employee in the performance of Employee's job duties for the Company.   All copyrightable materials of the Work Product shall be deemed a "work-made-for-hire" for the purposes of U.S. Copyright Act, 17 U.S.C. § 101 et seq., as amended.

*Id.***,** § 5.

48.     Upon executing the Agreement, Rhodes expressly agreed that WEG would be entitled to injunctive relief in the event that he breached any of the provisions of the Agreement: "Employee hereby agrees that any remedy at law for any breach of the provisions contained this Agreement will be inadequate and that the Company will be entitled to injunctive relief in addition to any other remedy the Company might have under this Agreement." *Id.***,** § 6.

**D.     Rhodes, in the Days and Months Leading up to His Resignation, Stole from WEG Invaluable Confidential and Proprietary Information and Trade Secrets.**

49.     On June 4, 2024, Rhodes provided his notice of resignation of employment with WEG effective June 18, 2024.

50.     Unbeknownst to WEG, two days *before* Rhodes tendered his notice, Rhodes began deleting data off his WEG-issued laptop



Unredacted screenshots of the information deleted by Mr. Rhodes will be submitted under seal and are incorporated herein as **Exhibit F**.

51.    Among the foregoing files are confidential project-related materials, proprietary marketing and pricing information, various client and prospect-related data, including pricing data for Customer A, and a rolling action item list for Customer B.

52.    The "May 2024 – BDM Presentation Template Rhodes…" would be valuable to competitors by informing them how WEG markets and sells its emerging BESS products. It is also valuable to WEG as a template it uses as starting point for its sales presentations.

53.    "[CUSTOMER B] and WEG BESS Rolling-Action-Item-Log-05…" would be valuable to competitors because it contains massive amounts of information regarding the relationship between WEG and this customer and would enable a competitor to quickly step into WEG's business relationship with the customer.

54.    Customer B is a current BESS customer that Rhodes serviced during his last year of employment with WEG.

55.    "Pricing Extrapolation.xlsx" would be valuable to competitors because it contains non-public pricing information. It would be very difficult, if not impossible for competitors to reverse engineer this information and the information

is obviously useful for competitors seeking to compete against WEG on pricing. Notably, the "Pricing Extrapolation.xlsx" file was not among those returned by Rhodes.

56.    "Chemistry Overviews.pptx" would be valuable to competitors because it contains proprietary product information. Similar to other information, it would be very difficult, if not impossible for competitors to reverse engineer this information and the information is obviously useful for competitors in competing against WEG on pricing. The "Chemistry Overviews.pptx" file was also not among those returned by Rhodes.

57.    "[Customer A] Partnership Discussion.docx" and "Pricing Estimation Matrix for [Customer A].pdf" would be valuable to competitors because they contain non-public, customer-specific information, including individually negotiated or offered pricing. Similar to other information, it would be difficult, if not impossible, for competitors to reverse engineer this information and the information is obviously useful for competitors in competing against WEG on pricing. Neither the "[Customer A] Partnership Discussion.docx" nor the "Pricing Estimation Matrix for [Customer A].pdf" files were among those "returned" by Rhodes.

58.    Customer A is a client for whom Rhodes and the BESS team were working on a significant, pending bid at the time Rhodes resigned from the Company.

59.     Unaware of Rhodes' misconduct, Rhodes' direct supervisor, Chuck Mong, responded to Rhodes' notice of resignation by requesting that Rhodes travel to Atlanta during his notice period so that Mong and Rhodes could assist with the transition of Rhodes' customer accounts and prospects, for an exit interview with WEG's human resources team, and to return his company equipment.

60.     Rhodes accepted Mong's proposal and met with Mong on June 12-13, 2024.

61.     During his visit to Atlanta, Rhodes continued deleting proprietary Customer B-related WEG data from his company-issued laptop:



**Exhibit F**.

62.     Sometime thereafter, Mr. Rhodes deleted additional information from his company issued laptop:



**Exhibit F**.

63.     These documents also represent critical and protectable company

information. "WEG Project References 5-26-2021.docx," for example appears to reflect information associated with WEG's current or previous projects, including customer information, project data, locations, size, and/or values and would be valuable to a competitor looking to service the same set of customers. This information is also valuable to WEG as a means by which it markets its experience expertise in the BESS-space.

64.    Rhodes' counsel has represented that Mr. Rhodes "categorically denies any intentional wrongdoing. Personal and professional data are often intertwined, especially in roles requiring remote and travel-based work, and any deletions were limited to personal data to maintain privacy." Communications with Rhodes' Counsel at 2 and which is attached hereto as **Exhibit G**.

65.    The deleted files and folders displayed in the previous screenshots are obviously not personal in nature. One of the deleted folders, for example, is entitled "Michael @ Work." Others, as previously described, directly relate to customer servicing and bid-related information.

66.    On June 13, 2024, Rhodes returned to the office for his exit interview, where he met with WEG HR and legal representatives. WEG's legal counsel reminded Rhodes of his continuing obligations under the Agreement and urged Rhodes to search his personal files, computers, drives, phones, and other devices for WEG property. HR also provided a letter from legal counsel describing the Rhodes'

continuing obligations under the Agreement, as well as federal and state law. A copy of this Continuing Legal Obligations Letter is attached as **Exhibit H**.

67.    Upon receipt of his company-issued devices, WEG's IT team immediately began reviewing Rhodes' WEG computer, cell phone and accounts, so that the BESS team could continue to serve clients and work on the pending bid Customer A.

68.    The IT team's analysis quickly led to the revelation of Rhodes' deletion efforts between June 2-13, 2024.

69.    Mr. Mong also informed WEG's counsel that Rhodes was storing WEG's files on a personal Hard Drive due to purported computer issues and had downloaded 3,000 customer leads using WEG's Dun & Bradstreet account credentials, in violation of WEG's policies, the Agreement, and his legal obligations to WEG.

70.    Mr. Mong did not have the authority to allow Rhodes to use the Hard Drive in violation of WEG's IT Policy and it is unclear why Rhodes could not get a new WEG computer or use WEG's OneDrive account (as he was supposed to) to store the WEG files needed for his work notwithstanding the alleged problems with his work computer.

71.    Accordingly, mere hours after WEG's in-house counsel reminded Rhodes of his continuing obligations to the company, counsel sent a cease-and-

desist-email to Rhodes at michael.l.rhodes@gmail.com: "When I briefed you this morning regarding your continuing obligations with respect to the used and disclosure of WEG's confidential information, it was on the assumption that you had not already violated the law or your NDA…" A copy of this correspondence is attached hereto as **Exhibit I.**

72.     In the cease-and-desist letter, WEG demanded that Rhodes return the Hard Drive containing WEG's information within five business days.

73.     On June 14, 2024, Rhodes responded, via his own counsel, but would not commit to returning WEG's data. Instead, Rhodes' attorney stated that five days would be insufficient for her to determine how she should advise Mr. Rhodes to proceed. A copy of Rhodes' response to the cease-and-desist letter is attached hereto and incorporated herein as **Exhibit J.**

74.     Mr. Mong also texted Rhodes to ask him not to delete WEG's information and to return the Hard Drive. Rhodes was similarly dismissive in response to Mr. Mong's entreaties.

75.     Mr. Mong, who was friends with Rhodes and knew he had been unhappy at WEG for a while, was caught off guard by Rhodes' response. He thus began reviewing recent emails and discovered that Rhodes, while still employed by WEG, began using his personal email account for customer RFPs. An example of a May 24, 2024 RFP which Rhodes sent to his personal michael.l.rhodes@gmail.com

email account will be filed under seal and is incorporated herein as **Exhibit K** (emphasis added)**.**

76.    Upon further review of Rhodes' recent emails, WEG learned that Rhodes developed a system whereby he would transfer confidential RFP access and other information to himself by sending it from his michael.l.rhodes@gmail.com account to both the same michael.l.rhodes@gmail.com account and his work email account. Between March 25, 2024 and June 4, 2024 Rhodes engaged in this practice with regard to at least 15 other RFPs. An example of an RFP which Rhodes sent to his personal michael.l.rhodes@gmail.com email account will be filed under seal and is incorporated herein as **Exhibit L.**

77.    Upon information and belief, Rhodes began diverting RFPs to his personal email account so that the leads he generated at WEG would follow him when he left the company. Rhodes had no legitimate business reason to send customer leads to his personal email account.

78.    On June 17, 2024, Rhodes committed to returning copies of what Rhodes purports to be all of the company data he retained. To WEG's surprise, Rhodes returned thousands of company documents, totaling several gigabytes in size.

79.     Among the information Rhodes "returned" (but of which Rhodes still has copies) were literally hundreds files containing critical and protectable company information. By way of example only, the following were among the files returned:

- All BESS Opportunities-2024-05-22-10-37-12.xlsx

- BESS Contact List-2024-04-29-07-00-01.xlsx

- [Customer B] and WEG BESS Rolling-Action-Item-Log-04192029.xlsx

- Pricing Matrix 05022024.xlsx

- Copy of WEG Intake Form_v2 Mass 5mw.xlsx

- WEG Intake Form_v02 [Customer C] Rochester.xlsx

- WEG EMS Layout.pptx

- WEG BD Planning 5yr Outlook.pptx

- May 2024 – BDM Presentation Template Rhodes rev D.pptx.

80.     Among the foregoing files are various client and prospect lists that include the nonpublic contact information for specific company contacts that may have authority to engage with BESS providers like WEG, company templates, and a long-term sales strategy presentation.

81.     "All BESS Opportunities-2024-05-22-10-37-12.xlsx" is an internal spreadsheet setting forth all of the potential opportunities Rhodes and his former colleagues (Mr. Mong and Lonnie Milligan) were actively working on as of May 22,

2024. This spreadsheet sets forth the employee seeking to close on the opportunity, the account name, the opportunity name, value of the opportunity to WEG's BESS division, the project type, and opportunity stage (such as Apply/Create Proposal, Closed Won or Lost, Investigate, or Convince). This spreadsheet would be very useful to a competitor seeking the same opportunities as WEG's BESS division. Moreover, the fact that Rhodes had this information on a personal drive 13 days before his resignation demonstrates a clear intent to take and use it on behalf of a competitor.

82.    "BESS Contact List-2024-04-29-07-00-01.xlsx" contains the personal contact information (including the contact's name and title, customer association, mailing address, as well as each contact's email address, work number, and mobile number) for the key decisionmakers of WEG's BESS Division clients. The kind of non-public, direct contact information contained in this document would be valuable to a competitor because it would enable them to get an unlawful head start on soliciting WEG's customers.

83.    "[Customer B] and WEG BESS Rolling-Action-Item-Log-04192029.xlsx is a spreadsheet of ongoing tasks for one of Customer B's projects. This document would be valuable to a competitor because they could use this information to seamlessly begin servicing Customer B on this or other projects

(especially if Rhodes was tasked with continuing to service Customer B on that competitor's behalf).

84.    "Pricing Matrix 05022024.xlsx" and "Copy of WEG Intake Form_v32 Mass 5mw.xlsx" are spreadsheets generated in relation to a project for Customer A that set forth the price per kilowatt hour and system prices for a Battery Energy Storage Solution based on the megawatts and hours duration. This form would be useful to any competitor seeking to price and sell Battery Energy Storage Solutions, especially in competition with WEG.

85.    "WEG Intake Form_v02 [Customer C] Rochester.xlsx" is project requirements form completed with information related an indicative proposal for Customer C. It contains the direct contact information for Customer C's point of contact, key dates, site and environmental data, system data, BESS usage profile, and project term / energy requirements among other data. This form would be useful to competitors seeking to service customers in the BESS industry and the information regarding Customer C's project would specifically be useful to any competitor seeking to work on the same or future proposals for Customer C.

86.    "WEG EMS Layout.pptx" contains a technical drawing of one of WEG's energy management system designs. This drawing would be useful to competitors seeking to develop their own energy management systems without investing the same time and financial investment that WEG did to develop its design.

87.   "WEG BD Planning 5yr Outlook.pptx" is a long-term strategy document that, among other things contains various analyses of the current market, WEG's competitors, market barriers, available products and services, as well as strategies for growing WEG's market share within the BESS industry. Again, this document would be invaluable to WEG's competitors also seeking to grow their market share within the BESS industry.

88.   "May 2024 – BDM Presentation Template Rhodes rev D.pptx" is the same document described in Paragraph 37 or a different version of the same document. It would be valuable to competitors by informing them how WEG markets and sells its emerging BESS products. It is also valuable to WEG as a template it uses as starting point for its sales presentations.

89.   On June 20, 2024, Rhodes executed an affidavit in which he admitted having "access to WEG's confidential and proprietary information as well as trade secrets" during his employment with the company and that he still retains "information regarding his employment with WEG." A copy of Rhodes' June 20, 2024 affidavit (the **Affidavit**") is attached hereto and incorporated herein as **Exhibit M.**

90.   In the Affidavit, Rhodes states that he "will remove any and all information regarding his employment with WEG from any and all devices in [his] possession once the litigation hold has been lifted." *Id.* In other words, Rhodes will

self-select the information he believes should be deleted once this matter has been resolved.

91.     WEG had good reason to doubt this and other of Rhodes' representations. Having compared the information that Rhodes returned to WEG on or around June 17, 2024 to those files he accessed using various removable devices during his employment, WEG knows the information that Rhodes is referring to as "all information" is incomplete.

92.     While the new hard drive information received by WEG was far more expansive than expected, it still did not contain numerous files containing highly confidential information. Most notably, the information returned did not contain a copy of the Hard Drive's "Marketing" folder or most of the documents known to be contained within that folder. *See* **Exhibit A**, ¶¶ 8-14.

93.     The information in the Marketing folder is not of a personal nature, such that Rhodes had any legitimate reason to believe he has the right to retain and use this data following the termination of his employment from WEG. Subfolders within the "Marketing" folder include, but are not limited to:

- D:\Marketing\Data from D&B

- D:\Marketing\Marketing\Battery Supplier Evaluations; and

- D:\Marketing\Marketing\Battery Technology.

***Id.***, ¶ 9.

94.     The documents stored within the E:\Marketing\WEG Pricing  subfolder only solidifies that it is professional- and WEG-related in nature. For example, each of the following are contained in the WEG Pricing subfolder and appear to have been last opened or accessed on Rhode's WEG laptop during 2024:

- E:\Marketing\WEG Pricing\Breakdown Comparison of Proposals.pptx (last opened or accessed January 17, 2024)

- E:\Marketing\WEG Pricing\Pricing  Comparison  01172024.xlsx  (last opened or accessed January 17, 2024)

- E:\Marketing\WEG Pricing\Product Pricing 01192024.xlsx (last opened or accessed May 2, 2024)

- E:\Marketing\WEG Pricing\Product Pricing 02022024.xlsx  (last opened or accessed May 2, 2024)

- E:\Marketing\WEG  Pricing\Requested  Pricing  Changes  01182024.xlsx (last accessed January 18, 2024).

*Id.*, ¶ 10.

95.     The new hard drive also contained several folders that were inexplicably empty. For example, the file path "E:\WEG\Customers\Proposals\[Customer D]\DC Fast Charging" contains five folders: (1) Working; (2)  To [Customer D]; (3) Proposal Sections; (4) Internal; and (5) From [Customer D].

96.     Forensic data from Rhodes' laptop indicates that he accessed documents that used to be in these subfolders on the Hard Drive, for example "030773.000.00 WEG - EMS EV Grid Firming R0_20221213.pdf" *Id.*, ¶¶ 12-13.

97.    Rhodes last accessed "030773.000.00 WEG - EMS EV Grid Firming R0_20221213.pdf" on May 16, 2024. ***Id.***

98.    Although it is unclear precisely what is contained in this document, WEG has spent significant sums on research and development related to grid firming—a technique to keep a grid stable in the fact of potential wind, solar, and hydro intermittency. If Rhodes is permitted to keep work product related to grid firming, he will enable a competitor to improperly benefit from WEG's monetary and sweat investment in this area.

99.    The information that Rhodes "returned" did not include copies of the 3,000 D&B customer leads that Rhodes improperly downloaded prior to the termination of his employment with WEG. Based on Rhodes' apparent organizational system, these leads are most likely saved to the "Data from D&B" subfolder within the Hard Drive's unreturned Marketing folder. **Exhibit A**, ¶ 11.

100.    Rhodes similarly did not return many of the files Rhodes deleted from his laptop in June of 2024, or any information regarding the RFPs Rhodes diverted to his Gmail account. It is not hard to imagine that the latter files may also be saved somewhere within the Hard Drive's Marketing folder or on Rhodes' other devices and accounts.

101. Importantly, Rhodes' use of unsanctioned devices was not limited to the Hard Drive. Between March 13, 2024, and June 14, 2024, Rhodes inserted approximately 15 storage devices into his WEG laptop:

| Serial/UID | Description | First Connected (UTC) | Last Connected (UTC) |
|---|---|---|---|
| 323233333741343030323235 | SanDisk Extreme 55AE SCSI Disk Device | 6/13/2024 14:16 | 6/13/2024 18:16 |
| 6&3516db6b&0&000001 | Extreme 55AE | 6/13/2024 14:16 | 6/13/2024 18:16 |
| 57583431413435435454354C | WD Passport X 107D USB Device | 11/2/2022 13:03 | 6/5/2024 19:54 |
| 6&33f7855 | General UDisk USB Device | 3/13/2024 9:03 | 6/5/2024 19:20 |
| 5&18B03FC7&0&4 | General  UDisk | | 6/5/2024 19:20 |
| 7&397ba757 | General UDisk USB Device | 6/3/2024 14:00 | 6/3/2024 18:00 |
| 8&3A944CE5&0&4 | General  UDisk | | 6/3/2024 18:00 |
| 6&34ed999a | General UDisk USB Device | 3/13/2024 12:00 | 6/3/2024 17:37 |
| 5&18B03FC7&0&7 | General  UDisk | | 6/3/2024 17:37 |
| 20016017052030000146 | PHD 3.0 Silicon-Power SCSI Disk Device | 8/14/2023 12:57 | 6/3/2024 1:43 |
| 071829B99C86C000 | Memorex USB Flash Drive USB Device | 9/20/2023 12:09 | 5/17/2024 14:25 |
| 7&1b20746b | Billboard Device | 3/13/2024 12:00 | 5/6/2024 14:24 |
| 37273E9C60126171 | USB Disk USB Device | 8/11/2023 7:59 | 4/6/2024 16:27 |

| 6&3b6c8a44 | General UDisk USB Device | 3/13/2024 12:07 | 3/13/2024 16:07 |
|---|---|---|---|
| 5&18B03FC7&0&1 | General  UDisk | | 3/13/2024 16:07 |

**Exhibit A**, ¶ 5.

102.   It is unclear whether any of WEG's information from the foregoing devices is among that data that Rhodes "returned."  Rhodes did not return the thumb drives themselves.

103.   These omissions demonstrate why Rhodes' representations in his Affidavit are insufficient. Rhodes is not the proper party to determine what information is and is not subject to the legal and contractual obligations he owed to WEG, and, to date, he has refused to subject any of his personal devices (including the personal Hard Drive) to forensic analysis so that WEG can determine the full scope of data misappropriated.

104.   On June 18, 2024, WEG's outside counsel proposed steps that would allow WEG to determine the full scope of Rhodes' conduct while also safeguarding Rhodes' personal information and without putting any financial burden on Rhodes, which counsel confirmed in writing later that day via email:

1. We engage a third-party forensic neutral to image and analyze any relevant devices and accounts, starting with Mr. Rhodes' hard drive and his cloud-based storage accounts to determine when and how WEG information has been accessed and whether it has been transferred to any other devices. This would be an iterative process wherein additional devices and accounts may also need to be imaged and analyzed to the extent the original analysis indicates that data was transferred, for example, from the hard drive to a personal laptop or his current work laptop.
   a. We would work together to develop a protocol for identifying WEG-related data only and for excluding any personal information. Typically, parties do this by agreeing to particular search terms and/or location parameters.
   b. My client is willing to pay the costs necessary to complete this analysis, with the caveat that it reserves the right to later seek these costs in litigation if this process uncovers wrongdoing.
2. The third party forensic neutral would permanently sanitize all WEG-related data from the hard drive and any other location where it is found.
3. Mr. Rhodes will need to sign a declaration under oath attesting he no longer has any physical or electronic confidential information, that he did not use WEG's data while it was in his possession, he has not transferred WEG's data (by saving, uploading, forwarding it, etc.) to any other location) to himself of anyone else (or any entity) to use, he (following the neutrals deletion efforts) no longer has access to any WEG-related data, and he will not attempt to recover or otherwise obtain possession of this data after executing the declaration.
4. Return of any WEG-related data in Mr. Rhodes' possession not included on the device FedExed to WEG yesterday (if any).

A true and correct copy the pre-litigation email exchange between counsel attached hereto and incorporated herein as **Exhibit G at 7-8.**

105.  Rhodes' attorney has consistently maintained that Rhodes cannot agree to turn over any items for WEG to inspect because it would be "an extreme and unwarranted invasion into his personal life" and would "entail a significant financial burden." *Id.* **at 5.**

106.  WEG's counsel has pointed out the holes in Rhodes' purported justification for refusing to engage in the forensic process, though these explanations have fallen on deaf ears:

- As to cost concerns: "I am unclear as to how this process would entail a 'significant financial burden' given that WEG has agreed to pay the

costs, at least up front. If [Rhodes] agrees to a remediation process without litigation, WEG will pay for it.";

- As to privacy concerns: "I am also unclear as to how this process would be 'intrusive' given that we explicitly offered to develop a protocol that would segregate personal information from professional."

- As to indications of wrongdoing: "we are already way beyond that point. The copies of information 'returned' by your client included many, many files containing WEG's trade secret and confidential information. His failure to return this information upon his termination alone constitutes a breach of contract, violation of the DTSA, and PUTSA. While your client may deny further wrongdoing (though we are confident his position will be disproven by the forensic evidence WEG is continuing to collect in its investigation), it is simply disingenuous to ignore his unlawful possession of WEG's information."

*Id.* at 3-4.

107. WEG's counsel further explained why Rhodes' representations and actions to date were insufficient to assuage WEG's concerns and asked Rhodes to reconsider its offer to engage in a forensic process to avoid litigation. *Id.*

108.   The reports generated by WEG's forensic expert set forth at least a portion of Hard Drive's folder structure, which is how WEG learned about the missing Marketing folder and the data contained thereon. **Exhibit A**, ¶ 8.

109.   Rhodes set up a highly detailed folder structure on the Hard Drive. He had separate folders for each of the following: (1) "Applications"; (2) "Business Planning and coverage"; (3) "Customers"; (4) "Data"; (5) "Forms" ; (6) "Hard Drive Backup"; (7) "HR"; (8) "Meetings" (as in WEG-related meetings); (9) "Marketing"; (10)  "Misc Files" (at least 253 files of which were returned already as WEG-related); (11) Personal; (12) "Projects" (for WEG); (13) "Sales Tracking"; and (14) "WEG."  In turn, most of these subfolder also contain multiple layers of subfolders. *Id.*

110.   There is no evidence as of the filing of this Complaint that Rhodes mixed his personal files with his professional ones. To the contrary, the available evidence indicates that Rhodes was methodical about not intermingling the two kinds of information. *Id.*, ¶ 15.

111.   Accordingly, it is insincere of Rhodes to take the position that forensic imaging of the Hard Drive would result in a "significant invasion of [Rhodes'] privacy" or of a significant financial burden due to his counsel's need to be "intimately involved." It would be exceedingly simple to segregate the "Personal" folder and for a forensic neutral – i.e., a neutral not affiliated with either party

individually and with whom neither is permitted to interact on an *ex parte* basis – to determine the full scope of Rhodes' conduct.

112.   Rhodes' unwarranted refusal to engage in a controlled, neutral examination of the Hard Drive further underscores why it has become necessary to initiate litigation.

113.   Moreover, Rhodes' Affidavit is premised on the information that *Rhodes* believes to be the subject of his contractual and legal obligations. For this reason, any representations that he "has not used or transmitted" certain information as contained in the Affidavit are not sufficient alone to ensure that Rhodes has not engaged in further misconduct, such as by using WEG's pricing information contained in the Hard Drive's unreturned "Marketing" folder.

114.   It is WEG's contractual and legal right to have all of its data returned now that Rhodes is no longer an employee. Absent the relief sought herein, WEG cannot ensure that *all* copies of the stolen data (including the Hard Drive containing this information) have been properly returned (or purged) and that no improper transmission of this data has occurred in the interim. Rhodes has provided only disingenuous responses to WEG's follow-up questions regarding certain topics (for example, why he placed WEG's information on a non-company Hard Drive in violation of the IT Policy despite the availability of company-devices and cloud-

based accounts to store this data) and ignored others (such as why he began diverting RFPs to his personal email account).

115.   The contents of the new device onto which Rhodes copied the WEG-related information on the Hard Drive is positively replete with WEG's confidential information. This new drive contains hundreds (if not thousands) of files, all of which are WEG business documents or third-party documents entrusted to WEG by its customers and business partners.

116.   WEG will suffer significant losses and irreparable harm if Rhodes is permitted to retain WEG's confidential and proprietary information. A significant portion of the BESS-related business previously managed by Rhodes is at risk if Rhodes is allowed to violate his contractual commitments and his obligations under state and federal trade secret laws. Armed with a multitude of trade secrets, Rhodes is poised to steal business – indeed, an *entire emerging business division* – unless this Court requires him to live up to his promises and legal obligations.

117.   It is extremely difficult to put a precise value on the client relationships and business system at issue as that number necessarily fluctuates over time. WEG has no way of knowing with certainty how long it would retain the customers at issue or what spinoff business it would get from them. The only way to prevent incalculable damage to the relationships is to prevent Rhodes from breaching his contractual commitments and obligations under state and federal law. As such, WEG

is entitled to injunctive relief to enforce the Agreement, including the non-disclosure provision.

118.   Likewise, WEG has spent substantial time and effort building up goodwill with its customers. Again, while it is hard to put a precise value on that element, customer goodwill and the cumulative business borne of that goodwill are critical for WEG's continued success. Rhodes' calculated course of illicit conduct endangers that goodwill.

119.   Finally, WEG's trade secrets have substantial value precisely because they are not known to competitors. The BESS-related materials would be dangerous in the hands of Rhodes or a competitor, which is precisely why Rhodes went to the trouble of stealing them.

120.   Because Rhodes does not intend to comply with the Agreement or trade secret law, WEG has no alternative remedy other than to request this Court issue immediate injunctive relief. This is the only way to preserve the value of the trade secrets. Thus, the Court should require Rhodes to purge himself of all copies of this data, ensure that they are not in the hands of any third parties (especially competitors), and prevent the use or disclosure of those confidential and proprietary materials.

## COUNT I
## ACTUAL AND THREATENED MISAPPROPRIATION UNDER
## THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT ("PUTSA")

121.   WEG incorporates by reference its allegations set forth in the preceding paragraphs of this Verified Complaint as if fully set forth herein.

122.   The information described in paragraphs 6-7, 51-58, 61-63, 76-88, and 92-99 above, (pricing tools, non-public customer contact information; presentation templates, and ongoing customer servicing information) constitute trade secrets as defined in the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. §5301 *et seq.* because WEG derives independent economic value, actual or potential, from such information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

123.   WEG takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. These measures include: the use of non-disclosure agreements and Code of Conduct policies regarding the treatment of confidential information; exit procedures to ensure that departing employees are reminded of their obligations not to retain confidential materials; training on proper treatment of confidential information; IT security measures and policies; and need-to-know restrictions on certain information.

124.   Rhodes engaged in misappropriation by acquisition under 12 Pa. Cons.Stat. § 5302(1).

125.   Rhodes acquired knowledge of WEG's trade secrets only after he executed the Agreement and agreed to the non-disclosure of return of property provisions under Sections 4.2-4.3 thereof, and after agreeing to and acknowledging WEG's policies, which further restrict the use of WEG's information (including its trade secret information) other than in the scope of an employee's work for or on behalf of WEG, including WEG's IT Policy, Code of Ethics, and U.S. Based Ethics Policy.

126.   Rhodes had a duty to maintain the secrecy of WEG's confidential and trade secret information, and agreed, pursuant to Sections 4.1 and 4.3 of the Agreement that he is not allowed to retain, use, or disclose any confidential or trade secret information following his termination from WEG.

127.   Rhodes purposefully and repeatedly disregarded his obligations to WEG by transferring trade secret documents to the Hard Drive, which he  refused to return all copies of to WEG.

128.   Rhodes also inserted approximately 15 unsanctioned storage devices into his WEG-issued laptop, and upon information and belief transferred WEG's confidential information and trade secret information to one or more of these devices, and failed to return the trade secret information thereon.

129.   Rhodes knew or had reason to know that it was improper to divert, transfer, copy, and retain WEG's trade secret information as evidenced by his signed Agreement.

130.   Rhodes has likely also used and/or disclosed (or is planning to use and/or disclose) WEG's trade secrets without authorization (express or implied) at a time that he knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain this information's secrecy or limit its use.

131.   Rhodes' conduct and anticipated conduct described herein constitutes unlawful misappropriation of trade secrets under the PUTSA and justifies the award of exemplary damages and attorneys' fees and costs to WEG.

132.   Rhodes' conduct constitutes an actual or threatened misappropriation of trade secrets that forms an adequate, independent basis upon which this Court can enter a preliminary injunction.

133.   As a consequence of the foregoing, WEG has suffered and will continue to suffer irreparable harm and loss.

134.   Unless Rhodes and those acting in concert with him are preliminarily and permanently enjoined from further misappropriation of WEG's trade secrets, Rhodes will continue to disregard WEG's rights to same and WEG will continue to suffer irreparable harm, loss, and injury.

<u>**COUNT II**</u>
**VIOLATIONS OF THE FEDERAL DEFEND TRADE SECRETS ACT**

135.   WEG incorporates by reference its allegations set forth in the preceding paragraphs of this Verified Complaint as if fully set forth herein.

136.   The information described in paragraphs 6-7, 51-58, 61-63, 76-88, and 92-99, above, (pricing tools, non-public customer contact information; presentation templates, and ongoing customer servicing information) constitute trade secrets of WEG subject to protection under the Defend Trade Secrets Act ("**DTSA**"), 18 U.S.C. § 1831 *et seq.*

137.   The trade secrets at issue are related to products or services used in, or intended for use in, interstate commerce.

138.   The information contained on WEG's devices and accounts, including customer-specific pricing information, which Rhodes took upon his departure, is valuable because it this information is not generally known or readily accessible, through proper means, to others who can profit from its use. WEG has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

139.   WEG takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. These measures include: the use of non-disclosure agreements and Code of Conduct policies regarding the treatment of confidential information; exit procedures to

44

ensure that departing employees are reminded of their obligations not to retain confidential materials; training on proper treatment of confidential information; IT security measures and policies; and need-to-know restrictions on certain information.

140.   Rhodes engaged in misappropriation by acquisition as defined under 18 U.S.C. § 1839(5)(A).

141.   Rhodes acquired knowledge of WEG's trade secrets only after he executed the Agreement and agreed to the non-disclosure of return of property provisions under Sections 4.2-4.3 thereof, and after agreeing to and acknowledging WEG's policies, which further restrict the use of WEG's information (including its trade secret information) other than in the scope of an employee's work for or on behalf of WEG, including WEG's IT Policy, Code of Ethics, and U.S. Based Ethics Policy.

142.   Rhodes had a duty to maintain the secrecy of WEG's confidential and trade secret information, and agreed, pursuant to Sections 4.1 and 4.3 of the Agreement that he is not allowed to retain, use, or disclose any confidential or trade secret information following his termination from WEG.

143.   Rhodes purposefully and repeatedly disregarded his obligations to WEG by transferring trade secret documents to the Hard Drive, which he refused to return all copies of to WEG.

144.   Rhodes also inserted approximately 15 unsanctioned storage devices into his WEG-issued laptop, and upon information and belief transferred WEG's confidential information and trade secret information to one or more of these devices, and failed to return the trade secret information thereon.

145.   Rhodes knew or had reason to know that it was improper to divert, transfer, copy, and retain WEG's trade secret information as evidenced by his signed Agreement.

146.   Rhodes has likely also used and/or disclosed (or is planning to use and/or disclose) WEG's trade secrets without authorization (express or implied) at a time that he knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain this information's secrecy or limit its use.

147.   Rhodes has likely also engaged in misappropriation by use or disclosure as defined under 18 U.S.C. § 1839(5)(B) by using or disclosing (or by planning to use or disclose) WEG's trade secrets without authorization (express or implied) at a time that he knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain this information's secrecy or limit its use.

148.   Rhodes' foregoing conduct constitutes an actual and threatened misappropriation and misuse of WEG's trade secret information in violation of the DTSA.

149.   As a direct and proximate result of Rhodes' actual and threatened misappropriation of WEG's trade secrets, WEG has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless Rhodes and those acting in concert with him are enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to WEG.

150.   As a direct and proximate result of Rhodes' misappropriation, WEG has suffered and/or will suffer damages and irreparable harm. In accordance with 15 U.S.C. § 1117, UPG is entitled to recover from Defendant CS&PC any profit it may have obtained as a result of its wrongful conduct, treble damages, costs, and attorneys' fees.  Additionally, UPG is entitled to injunctive relief according to the principles of equity pursuant to 15 U.S.C. § 1116.

151.   Each of the acts of misappropriation, as alleged in this Count II, was done maliciously by Rhodes, thereby entitling WEG to exemplary damages to be proved at trial and recovery of its attorneys' fees.

## COUNT III
## BREACH OF CONTRACT

152. WEG incorporates by reference its allegations set forth in the preceding paragraphs of this Verified Complaint as if fully set forth herein.

153. As a condition of the start of his employment with WEG and exposure to WEG's trade secret and confidential information, Rhodes executed the Agreement. *See* **Ex. B**.

154. The Agreement is a valid and enforceable contract between WEG and Rhodes. Rhodes' initial employment with WEG served as sufficient consideration in return for his commitment not to use, disclose, or retain the WEG's confidential and trade secret information and to, upon the termination of his employment, return to WEG all company documents and:

> files of any nature[], including all copies of such materials and all documentation prepared or produced in connection therewith, pertaining to the performance of Employee's services for the Company, the business of the Company or of the Associated Companies, or containing Trade Secrets or Confidential Information regarding the Company's business or the Associated Companies' business, whether made or compiled by Employee or furnished to Employee by virtue of his/her employment with the Company.

**Exhibit B**, § IV.

155. The Agreement's non-disclosure provision is reasonable under the circumstance to protect WEG's legitimate interests in its confidential information,

customer information, and trade secrets, as explicitly acknowledged by Rhodes in Section 7.3 thereof.

156.    WEG has complied with its obligations under the Agreement.

157.    Rhodes breached numerous portions of the Agreement, including Section 4.3 of Agreement by failing to return all files of any nature, including all copies of such materials and all documentation prepared or produced in connection therewith, pertaining to Rhodes' performance of services for WEG, the business of WEG or its associated company, or containing WEG's Trade Secrets or Confidential Information (as those terms are defined in the Agreement) or such information of the Associated Companies (as defined in the Agreement).

158.    For example, regardless of whether customer leads Rhodes downloaded are considered Confidential, even if (as his counsel represented) Rhodes obtained this information, "in his capacity as a[ WEG] employee", he violated Section 4.3 of the Agreement by not delivering this information to WEG upon the termination of his employment."

159.    Rhodes also violated Section 4.1 of the Agreement by, without WEG's express consent, disclosing, copying, using, and/or divulging to a third party, WEG's Confidential and/or Third Party Information, beyond what was necessary in performance of Rhodes' duties while employed with WEG.

160.   Rhodes also violated Section 4.2 of the Agreement by, without WEG's express written consent, disclosing, copying, using, and/or divulging to a third party, WEG's Trade Secrets, beyond what was necessary in performance of Rhodes' duties while employed with WEG.

161.   Rhodes warranted in the Agreement that WEG would be entitled to injunctive relief in the event that he breached one or more terms of the Agreement.

162.   Because WEG is without an adequate remedy at law for Rhodes' breaches of the Agreement, he should be temporarily, preliminarily, and permanently enjoined from violating the Agreement's terms.

163.   WEG is further entitled to monetary relief from Rhodes in the form of lost profits, unjust enrichment, and all other forms of relief as a result of his acts in violation of the provider agreements.

## COUNT V
## INJUNCTIVE RELIEF

164.   WEG incorporates by reference its allegations set forth in the preceding paragraphs this Verified Complaint as if fully set forth herein.

165.   In his capacity as a WEG Business Development Manager, Rhodes had access to WEG's trade secrets and confidential and proprietary information.

166.   In the days and hours immediately leading up to his departure from WEG, Rhodes accessed WEG's trade secrets without consent or permission. He then

pilfered this information and has and/or intends to use it for his and/or a competitor's benefit and to the detriment of WEG.

167.   Rhodes violated the Agreement, DTSA, and PUTSA by taking, refusing to return all copies and purge himself of, and likely using and/or disclosing (or planning to use and/or disclose) the information he obtained from WEG's devices and accounts databases through improper means for the benefit of a competitor.

168.   In the absence of injunctive relief, WEG will suffer irreparable harm, including, but not limited to, loss of customers, disclosure of customer information to one or more competitors, loss of goodwill and business reputation, and unknown economic loss.

169.   WEG has no adequate remedy at law.

170.   The potential harm to WEG if Rhodes is not enjoined is far greater than any harm Rhodes may suffer if injunctive relief is not granted.

171.   WEG is likely to prevail on the merits of its cause of action against Rhodes.

172.   The public interest weighs in favor of granting injunctive relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff WEG requests that this Court provide it with injunctive relief and monetary damages against Defendants Rhodes in the following forms:

a.    A temporary restraining order requiring Rhodes and all those acting in concert with him to:

(i)    return to WEG all confidential, proprietary, and trade secret information belonging to WEG that is within their possession;

(ii)    refrain from retaining, using or disclosing confidential, proprietary, and trade secret information belonging to WEG;

(iii)    delete all confidential, proprietary, and trade secret information and copies thereof, belonging to WEG that is within their possession; and

(iv)    comply with the obligations set forth in the Agreement, including but not limited to the non-disclosure provision;

(v)    make available for inspection and/or imaging any computers, tablets, smartphones, external storage devices, personal data devices, or ESI storage accounts (such as cloud-based storage accounts) on which Rhodes, or any non-WEG-affiliated individual  accessed and/or retained WEG's confidential information or trade secrets as well as any and all Cloud-based file management accounts (including Gmail, iCloud, and Dropbox), email accounts, or other devices or accounts on which WEG's information could reside;

b.    A preliminary injunction, enjoining and restraining Rhodes and all those acting in concert with him as set forth in Paragraphs a(i)-(iv) above pending the final determination of this action;

c.    A permanent injunction enjoining and restraining Rhodes and all those acting in concert with him as forth in Paragraphs a(i)-(iv) above;

d.    An award of actual and compensatory damages in an amount to be proven at trial;

e.    An award of exemplary and punitive damages to be proven at trial;

f.    Pre-judgment and post-judgment interest;

g.    An award of reasonable attorneys' fees and costs incurred in this action; and

h.    Such other relief as is just and proper.

Respectfully submitted this 6th day of August, 2024,

_s/Michael Elkon_____
Michael P. Elkon
Georgia Bar No. 243355
Lauren S. Frisch
Georgia Bar No. 410927
Nicole B. Holtzapple
Georgia Bar No. 940598
FISHER & PHILLIPS LLP
1230 Peachtree Street, NE
Suite 3300
Atlanta, Georgia 30309
Phone (404) 231-1400
Facsimile (404) 240-4249
melkon@fisherphillips.com
lfrisch@fisherphillips.com
nholtzapple@fisherphillips.com

**_Counsel for Plaintiff WEG Electric Corp._**

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **WEG ELECTRIC CORP.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No._____** |
| | ) | |
| **MICHAEL L. RHODES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## CERTIFICATE OF SERVICE

The undersigned warrants that on August 6, 2024, he filed the foregoing VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES with the Court's ECF system, and that the foregoing Motion will be served on Defendant's counsel, who previously agreed to accept service of process of the Verified Complaint filed in this case as follows:

> Kayla Drum, Esq.
> Michael Kraemer, Esq.
> MKO Employment Law LLC
> 429 4th Avenue, Suite 300
> Pittsburgh, PA 15219-1507
> k@mkolaw.com
> m@mkolaw.com

> */s/ Michael P. Elkon*
> Michael P. Elkon
> Georgia Bar No. 243355
> melkon@fisherphillips.com

> ***Attorney for Plaintiff WEG Electric Corp.***

55